# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>ORLANDO BIRBRAGHER,<br><br>　　　　Defendant. | No. 07-CR-1023-LRR<br><br>**ORDER** |

## TABLE OF CONTENTS

*I.	INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *1*

*II.	PROCEDURAL HISTORY* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *1*

*III.	RELEVANT EVIDENCE* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*
　　*A.	**Information from Pretrial Services Report*** . . . . . . . . . . . . . . *2*
　　*B.	**Evidence Received at the Detention Hearing*** . . . . . . . . . . . . *4*

*IV.	RELEVANT LAW* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *9*

*V.	ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *12*
　　*A.	**Parties' Arguments*** . . . . . . . . . . . . . . . . . . . . . . . . . . . . *12*
　　*B.	**Application*** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *12*

*VI.	CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *14*

## *I. INTRODUCTION*

The matter before the court is the government's oral motion for the pre-trial detention of Defendant Orlando Birbragher.

## *II. PROCEDURAL HISTORY*

On November 7, 2007, a federal grand jury returned a thirty-one-count Indictment against Defendant and five of his alleged co-conspirators, Marshall Neil Kanner, Jack

1

Eugene Huzl,[1] Douglas Willis Bouchey, Armando Angulo and Peter Colon Lopez. In relevant part, Count 1 charges Defendant with Conspiracy to Distribute Narcotics, in violation of 21 U.S.C. § 846. Count 2 charges Defendant with Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956(h).

On November 16, 2007, Defendant surrendered in this jurisdiction and was arraigned. He pled not guilty to both counts of the Indictment. The government orally moved for the pre-trial detention of Defendant and requested the detention hearing ("Detention Hearing") be delayed for three days. At Defendant's request, the court then scheduled the Detention Hearing for November 20, 2007.

At the Detention Hearing, Assistant United States Attorneys Stephanie Rose and Matthew Cole represented the government. Attorney Richard Diaz represented Defendant, who was personally present.

Following the Detention Hearing, the court gave the attorneys the option of filing additional briefs, which the attorneys declined. The court heard final arguments and announced it would issue a written decision as soon as possible. The court detained Defendant pending the instant Order.

### III. RELEVANT EVIDENCE

#### A. Information from Pretrial Services Report

The United States Probation Office ("USPO") prepared a Pretrial Services Report ("Report") with Defendant's assistance. According to the Report, Defendant is 50 years old. He was born in Colón, Panamá. His parents, Orlando Villarreal, Sr. and Feiga Birbragher, presently live in Panamá and Miami, Florida, respectively.

Defendant reported to the USPO that he came to the Miami area from Panamá in 1987. He states that he was a resident alien from about 1988 until 1999. Defendant stated that he became a United States citizen in 2000. He resides in Miami with his wife, Alexis,

---

[1] Jack Eugene Huzl died after he was indicted.

and their four-year-old child, David. Also in the home are Defendant's children from a prior marriage: Carla, age 24, and Andres, age 22.[2] Defendant has lived in his present home in Miami since June 2004 and has lived in the Miami community for twenty years. The Report indicates that Defendant's "employer" is "Investment Banker" and his income is $205,000 per year. The USPO either did not ask or Defendant did not state the name of his employer or his company. Defendant apparently told the USPO that he has been employed with "Investment Banker" for seventeen years. Defendant holds American and Panamanian passports.

Defendant reported other business endeavors. Defendant stated that he breeds Paso Fino horses. He also reported that he has been involved in providing "software packages to health care networks in South America"[3] since 2004. He reported that he travels to Panamá on business five days every month. Defendant claimed no income has been realized from his software sales and a mere $2,000 has been realized from his horse breeding business since 2006.

Defendant reported that he has $50,000 in cash and owns a home valued at $3.8 million. His equity in the home is reported to be $900,000 due to a mortgage and a home equity loan. He stated that he and his wife owe $30,000 in credit card debt. He reports that he pays $3,000 per month for leased vehicles and $1,300 for utilities.

According to Defendant, he has no physical or mental health issues and does not have a history of substance abuse. That information was contradicted by his arrest record. Defendant's arrest record shows a 1994 arrest by the United States Drug Enforcement Administration ("DEA") in Glenwood Springs, Colorado for money laundering and filing

---

[2] Defendant was married to Katia Gonzales from 1982 to 1989.

[3] During the Detention Hearing, information was presented that Defendant has a business in Panamá. Panamá is not a part of South America, so it is unclear if Defendant has business dealings in addition to those in Panamá.

fraudulent currency transaction reports. He was also arrested in 1995 by the Miami-Dade Police Department for driving under the influence of alcohol. The USPO reports that the disposition of these arrests is not known.

The USPO recommends pretrial detention because of the risk of flight.

### B. Evidence Received at the Detention Hearing

Defendant, his wife and his counsel first became aware that the government had linked Defendant to uncharged criminal activity when he surrendered in this jurisdiction on November 16, 2007. They also learned at that time that the government had developed evidence that Defendant may have made false statements on his application for United States citizenship.

DEA Special Agent Gary S. Coffman ("Special Agent Coffman") testified that from 1990 to 2003 he was assigned to Miami and Fort Lauderdale, Florida. During that time period, he worked on the case of *United States of America v. Manuel Noriega*, the prosecution of the deposed Panamanian president.[4] One of Noriega's alleged co-conspirators was Brian Davidow ("Davidow"). The charges involved, *inter alia*, smuggling of drugs and guns. It was in that connection that, in late 1990 and early 1991, Special Agent Coffman came to know Defendant, whose street name was "Toti." In preparation for the Davidow trial, Special Agent Coffman debriefed Defendant and reviewed debriefing statements that Defendant had made to other law enforcement agents. During that time period, Defendant also appeared and testified before a federal grand jury. Defendant testified under use immunity and was never prosecuted for his participation in illegal activity.

During his proffers and testimony, Defendant admitted to Special Agent Coffman

---

[4] *See, e.g., United States v. Noriega*, 683 F. Supp. 2d 1373 (S.D. Fla. 1988); *United States v. Noriega*, 746 F. Supp. 1506 (S.D. Fla. 1990), *aff'd* 117 F.3d 1206 (11th Cir. 1997), *cert. denied*, 523 U.S. 1060 (1998); *United States v. Noriega*, 40 F. Supp. 2d 1378 (S.D. Fla. 1999).

that he participated in arms and drug trafficking in the United States and Panamá. Although Defendant was not involved in any murders, murders did in fact occur within the drug organization with which he associated.[5]

Specifically, Defendant engaged in cocaine smuggling with Armet Paredes ("Armet") and Rubén Dario Paredes ("Rubén") beginning in 1983. Armet Paredes was Defendant's brother-in-law, the brother of Rubén and the son of General Rubén Paredes, a former member of the Panamanian military under General Manuel Noriega. Defendant, Armet and Rubén would hide cocaine in appliances, stereo equipment and the like and transport the same to Miami. Some time between 1993 and 1998, Defendant introduced Boris Olarte-Morales to Rubén and Armet to help them with their cocaine business. According to Defendant, that deal did not materialize. Sometime thereafter, Defendant traveled to Miami with Rubén and Armet and was introduced to Davidow, who was a partner in the cocaine business with Rubén and Armet. In 1985, Defendant put his friends in Panamá in touch with Rubén and Armet in order to transport cocaine. This deal did not go through because the parties could not agree to a price.

According to Special Agent Coffman, in late 1984, Defendant and his father operated a gun shop in Panamá City. Defendant's father also sold airplane parts to the Panamanian Defense Forces. They sold guns to Colombians, some of whom he knew were members of the M-19, a Colombian guerilla movement. In order to sell guns to the M-19 in Colombia, Defendant had to get permission from General Manuel Noriega and from Rubén, who was a high-ranking member of the Panamanian Defense Forces. Furthermore, a government authorization had to be secured to import the weapons into Panamá. Once the weapons arrived in Panamá, they were warehoused by the Panamanian Defense Forces. Finally, to complete the sale, the weapons had to be requisitioned from the Panamanian Defense Forces by the original consignee.

---

[5] Rubén Dario Paredes and Cesar Rodriguez were murdered.

In 1994, DEA agents in Tampa, Florida asked Special Agent Coffman to assist with a search warrant in February of 1994 at Defendant's apartment in Miami. Defendant was suspected of laundering drug proceeds on behalf of Colombian drug traffickers. An undercover agent met with Defendant on a couple of prior occasions. In March of 1993, Defendant laundered a substantial amount of money[6] on two occasions through Ocean Bank in the Miami area. At that time, Defendant's current wife, Alexis, was employed by the bank. Following the search warrant, Special Agent Coffman initiated the filing of a federal criminal complaint against Defendant in the Southern District of Florida for the crime of money laundering. On March 2, 1994, in Aspen, Colorado, Special Agent Coffman arrested Defendant and his wife pursuant to the complaint. Defendant returned to Florida and cooperated with law enforcement in return for dismissal of the charges against him. The DEA closed its case against Defendant in 1996.

Special Agent Coffman testified that Defendant has the capability to flee due to his connections with other foreign countries. Defendant and his current wife have traveled extensively and have conducted business overseas.

Special Agent Jeff McGuire ("Special Agent McGuire") of the Internal Revenue Service ("IRS") also testified. According to Special Agent McGuire, in May of 2004, DEA agents executed search warrants at the offices of Pharmacom International Corporation ("Pharmacom"), a business owned by Defendant and co-defendant Kanner. General ledgers were recreated through the IRS forensics lab. As of the date of the search, approximately $41 million had been deposited in Pharmacom bank accounts. Of that amount, approximately $3.7 million went directly to Defendant's accounts in the fifteen-month period from January of 2003 to May of 2004. In addition, in that same time period, Defendant was paid a salary in the amount of $410,000, and $2.5 million was funneled to

---

[6] Special Agent Coffman noted that DEA records reflected that Defendant laundered in excess of $100,000 in each of the two transactions.

Defendant indirectly through a number of businesses owned by Defendant.

Special Agent McGuire calculates that Defendant has received approximately $6.8 million from Pharmacom; however, law enforcement has only recovered approximately $4 million from Defendant. After the search in May of 2004, Defendant made substantial transfers of money to people to whom Defendant is related. For example, on May 29, 2004, Defendant transferred $400,000 to Anthony Lopez, his wife's brother, for a "real estate investment." Defendant also transferred money to his wife, Alexis, his daughter, Carla, and to Franklin Rodriguez, a man who is married to Defendant's cousin. According to Special Agent McGuire, Defendant also used Pharmacom monies to purchase boats, art work, horses and jewelry valued in excess of several hundred thousand dollars, which, to date, have not been seized. The seized records also reflect the transfer of funds from Pharmacom to bank accounts in Panamá for a business Defendant was forming in Panamá. From the records and according to defense counsel, it appears that the business intends to operate or function as Pharmacom did before it was closed by law enforcement. The court finds such a business would present the same type of safety risks to the public that were inherent in the Pharmacom business.

During the May of 2004 search, Special Agent McGuire also uncovered a curriculum vitae or resume purporting to describe Defendant's business and personal background. In the undated document, it is represented that Defendant is "Managing Director and Chief Executive Officer of Holding Funds International." Gov't Ex. 8. He is touted as "a recognized leader in various segments of the Financial Services Industry, including Commercial and Investment Banking, Syndication of Financial Products, as well as Corporate and Project Finance." *Id*. The document represents that Defendant has served as a director of several international financial institutions and that he has served as

an "IB"[7] for investment banking firms such as Prudential Securities and Merrill Lynch International. Defendant purports to have experience in South America, the Caribbean, Spain, France, England, Greece, Italy, Luxembourg, Yugoslavia, Poland, Egypt, Israel and Russia. He claims fluency in Spanish, English, Italian and French. Many of his business activities are shown as conducted in Panamá, with the remainder in Miami.

As of June 2006, according to Special Agent McGuire, Defendant had not filed a 2004 tax return. Defense counsel produced an alleged copy of Defendant's Form 1040 for the calendar year 2004, showing an adjusted gross income of $241,823 and a federal refund due of $19,565. It is not known whether the return was filed, although the name of the alleged tax preparer is typed in as is the date of preparation "September 11, 2007." Def. Ex. A. On the document, Defendant represents himself as an executive in "real estate sales." Def. Ex. A.

Special Agent McGuire concluded that, as a result of this investigation, seventeen doctors have been identified as prescribing drugs for customers of Pharmacom's website. Fourteen have cooperated with the government, providing information about the operation of Pharmacom. Also, key Pharmacom employees are cooperating, including the vice-president, the third corporate officer and the bookkeeper. Based on the materials presented to it, the federal grand jury returned the instant Indictment, charging Defendant with conspiracy to distribute controlled substances and money laundering.

Senior Special Agent Ted Johanns ("Special Agent Johanns") of Immigration and Customs Enforcement ("ICE") testified that he reviewed Defendant's immigration file in light of the information recently obtained from the DEA regarding Defendant's uncharged criminal conduct. Based on his review of Defendant's file, which he admitted was only recently obtained, there is a question as to whether Defendant made false statements in

---

[7] The court assumes from the context of the document that "IB" stands for Investment Banker.

obtaining citizenship. Specifically, on the Application for Naturalization, although he admitted three prior arrests, he did not disclose other criminal activity in Questions 15A and 12E that he had admitted to the DEA and the federal grand jury some years earlier. Special Agent Johanns testified that such a failure to disclose can result in additional criminal charges, loss of citizenship and removal from the United States.

Finally, Alexis Birbragher testified. She has been married to Defendant for twelve years and has known him seventeen years. She stated that she and Defendant would secure Defendant's bond with the equity in their home in Florida. She estimated the equity to be approximately $1.5 million. Mrs. Birbragher testified that her mother, Betty Iberia Lopez, who also lives in Florida, would secure Defendant's bond with the $500,000 equity in her home. Mrs. Birbragher testified that they have been "waiting" for the Indictment to be returned. She offered as evidence that her husband would not flee the fact that, after the search warrant was executed on Pharmacom, he traveled to Panamá on business and returned. Further, he appeared voluntarily on November 16, 2007 to answer the charges.

However, she admitted Defendant and his attorney did not know that the government had information about Defendant's prior criminal conduct from his DEA file until they arrived at the courthouse just prior to arraignment. Mrs. Birbragher also admitted her original name was Miriam Lopez. She changed her name some years ago. She also was previously arrested on the money laundering charge along with Defendant. At the time she was charged, she was an employee of Ocean Bank. Her brother, Anthony Lopez, currently works at a bank in Miami named IBJ Schroeder. Mrs. Birbragher testified that she had a bank account with $500,000 in it that had been given to her by her husband from Pharmacom funds.

## IV.  RELEVANT LAW

The Bail Reform Act of 1984, 18 U.S.C. § 3141, *et seq.*, compels the court to detain criminal defendants prior to trial if the court "finds that no condition or combination

9

of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community . . . ." 18 U.S.C. § 3142(e). In *United States v. Salerno*, the United States Supreme Court upheld the constitutionality of the Bail Reform Act of 1984, though noting that "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." 481 U.S. 739, 755 (1987).

A determination that a defendant poses a safety risk must be supported by clear and convincing evidence. 18 U.S.C. § 3142(f) ("The facts the judicial officer uses to support a finding pursuant to subsection (e) that no condition or combination of conditions will reasonably assure the safety of any other person and the community shall be supported by clear and convincing evidence."). As to the risk of flight, the Eighth Circuit Court of Appeals has repeatedly held that a preponderance of the evidence standard applies. *United States v. Abad*, 350 F.3d 793, 797 (8th Cir. 2003); *United States v. Kisling,* 334 F.3d 734, 735 (8th Cir. 2003); *United States v. Orta*, 760 F.2d 887, 891 n.20 (8th Cir. 1985) (en banc). It is sufficient for a defendant either to be found a risk of danger to the safety of the community or a flight risk to authorize detention. *United States v. Cantu*, 935 F.2d 950, 952 (8th Cir. 1991) (quoting *United States v. Sazenski*, 806 F.2d 846, 848 (8th Cir. 1986)).

Subsection 3142(g) lists the factors the court must consider in making its detention determination. Those factors are:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including–
>
>> (A) the person's character, physical and mental condition, family ties, employment, financial resources,

> length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>
> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. In considering the conditions of release described in subsection (c)(1)(B)(xi) or (c)(1)(B)(xii) of this section, the judicial officer may upon his [or her] own motion, or shall upon the motion of the Government, conduct an inquiry into the source of the property to be designated for potential forfeiture or offered as collateral to secure a bond, and shall decline to accept the designation, or the use as collateral, of property that, because of its source, will not reasonably assure the appearance of the person as required.

18 U.S.C. § 3142(g)(1)-(4).

Once it is established that there is probable cause that a crime has been committed, a rebuttable presumption for detention arises in certain types of cases, 18 U.S.C. § 3142(e), including violations of the Controlled Substances Act, 21 U.S.C. § 801, *et seq.*. The Controlled Substances Act includes § 846, under which the maximum statutory penalty is ten years or more. An indictment by a grand jury may establish probable cause to trigger the presumption. *United States v. Illas-Pellot*, 215 F.3d 1312, 1312 (1st Cir. 2000) ("The grand jury indictment facially established probable cause to believe that the appellant had committed a relevant drug offense punishable by a maximum term of at least ten years."); *United States v. Stricklin*, 932 F.2d 1353, 1355 (10th Cir. 1991) ("Here, the grand jury indictment of defendant was sufficient to establish a finding of probable cause

that he had committed a federal drug offense carrying a maximum prison term of ten years or more."); *United States v. Quartermaine*, 913 F.2d 910, 916 (11th Cir. 1990) ("A grand jury indictment provides the probable cause required by the statute to trigger the presumption."). The rebuttable presumption imposes on Defendant only a burden of production. *Abad*, 350 F.3d at 797. The burden of persuasion concerning the risk of flight and dangerousness remains with the government. *Id*. (quoting with approval *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001)); *see also Abad*, 350 F.3d at 800 ("We find the reasoning and conclusion in *Mercedes* persuasive."); *Mercedes*, 254 F.3d at 436 ("The government retains the ultimate burden of persuasion . . . that the defendant presents a risk of flight.").

## V. ANALYSIS

### A. Parties' Arguments

The government argues that there is probable cause to believe Defendant committed the criminal acts with which he is charged and Defendant should be detained pending resolution of this case because he is a safety risk and a flight risk. Defendant responds that there is ample evidence to support his pretrial release. The court finds it necessary to examine only the risk of flight.

### B. Application

Count I, the charge for conspiring to distribute drugs in violation of 21 U.S.C. § 846, supports a finding of probable cause and thus triggers a rebuttable presumption of detention. *See Illas-Pellot*, 215 F.3d at 1312; *Stricklin*, 932 F.2d at 1355; *Quartermaine*, 913 F.2d at 916. Therefore, Defendant bears the burden of production to defeat the presumption, although the government retains the ultimate burden of persuasion. *Abad*, 350 F.3d at 797.

Absent the presumption in the instant case, the application of the factors at 18 U.S.C. § 3142(g) militate strongly for detention. First, one of the crimes charged involves

the distribution of an extremely large quantity of controlled substances over the Internet; such charge subjects Defendant to a very lengthy term of imprisonment. *See* 18 U.S.C. § 3142(g)(1). Second, the evidence against Defendant appears strong. *See id*. § 3142(g)(2). Third, in addition to a charge of distribution of controlled substances, Defendant potentially faces a criminal charge of immigration fraud, which could result in the loss of his United States citizenship and removal from the United States. *See id*. § 3142(g)(3)(A). Fourth, Defendant has the ability to flee. He holds a Panamanian passport, has connections in Panamá and in other foreign countries through prior financial dealings and has admitted dealings or transactions some years ago involving cocaine and firearms. *See id*. Fifth, Defendant has the financial resources to flee and remain at large. Although considerable assets have already been seized in this case, Defendant still has assets in the amount of four million dollars that are presumably at his disposal, which could be used for the support of himself and his family if he decided to flee the United States. In addition, he has a business in Panamá, from which he could earn a living. Defendant is organizing a business similar to Pharmacom that would distribute controlled substances in South America. The Pharmacom business in the United States grossed over $41 million in a fifteen-month period before it was shut down by law enforcement. *See id*. Sixth, Defendant previously committed substantial federal violations, which involved the distribution of controlled substances and money laundering while living in the United States. *See id*.

The evidence presented by Defendant against detention is as follows. First, Defendant did not flee before he was indicted, even though he had the opportunity and the financial ability to do so. Second, Defendant is a naturalized citizen who has lived in the United States for over twenty years. Third, it has been at least a decade since Defendant's involvement in cocaine dealing and associations with cocaine dealers. Fourth, Defendant offered to post an appearance bond secured by real estate in the Miami area. Fifth,

Defendant offered to surrender his passports and agreed not to travel outside the United States until this matter is resolved.

Although Defendant attempts to satisfy his burden of production, *see Abad*, 350 F.3d at 797, two facts weaken his arguments against detention. Defendant did not know the government linked him to past criminal conduct until the morning he surrendered in this jurisdiction, and he did not know until the date of the hearing that the government had evidence that he had committed naturalization fraud. Thus, the case against Defendant is more serious than he may have initially perceived. Further, Defendant's contacts, financial resources and experience abroad provide him the means to flee and avoid detection with or without his passports.

Finally, the court is unimpressed with Defendant's surety offers. Defendant did not present any documentation of independent appraisals on the real estate he sought to post. Defendant's mother-in-law did not appear at the Detention Hearing to offer her home as security for his appearance.

The court examined the factors found in 18 U.S.C. § 3142(g) and weighed the evidence according to the standards discussed herein. Pursuant to the evidence presented and the rebuttable presumption of 18 U.S.C. 3142(e), the court finds by a preponderance of the evidence that Defendant is a risk of flight and that no condition or combination of conditions would reasonably assure his appearance for trial. *See Abad*, 350 F.3d at 797; *Kisling,* 334 F.3d at 735; *Orta*, 760 F.2d at 891 n.20.

## VI. CONCLUSION

**IT IS THEREFORE ORDERED**:

1. Defendant is detained without bond pending resolution of these criminal matters;

2. Defendant is committed to the custody of the Attorney General for confinement in a corrections facility separate, to the extent practicable, from

persons awaiting or serving sentences or being held in custody pending appeal;

3. Defendant is afforded reasonable opportunity for private consultation with counsel;

4. On order of a court of the United States or on request of an attorney for the government, the person in charge of the correctional facility in which Defendant is confined is directed to deliver Defendant to the United States Marshal for the purpose of an appearance in connection with a court proceeding; and

5. The period between the government's oral motion for detention and this Order is excluded from calculation under the Speedy Trial Act. 18 U.S.C. § 3161(h)(i)(F) (excluding delay resulting from the filing of any pretrial motion through the prompt disposition of the motion); *id.* § 3161(h)(1)(J) (excluding "delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court.").

**DATED** this 7th day of December, 2007.

_____
LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA